## WELLS vs. THOMAS & MARTIN.

A fraudulent sale set aside.

## APPEAL from Platte Circuit Court, (in Chancery.)

STRINGFELLOW, *for Appellant, insists*:

That the only evidence relied on to shew fraud, being the evidence as to the insufficiency of the consideration—that evidence was not such as to shew fraud. The defendant, Hamilton, had nothing until Wells advanced the money and purchased the land. He then had but eighty acres, for which he might be well content to take the improvement bought by Wells. There is no evidence to contradict the answer, which states that this was in good faith, and not to defraud any person.

The transfer was made before the judgments were rendered—indeed a few days after the suit was brought.

The defendant, Hamilton, prior to the entry, had no interest which could be subject to payment of debts, and had he refused to enter, and permitted Wells to enter, it would have been no fraud upon his creditors.

The alleged inadequacy of price does not render the conveyance fraudulent.

TODD, *for Appellees, insists*:

1st. That the facts prove a collusive sale, by Hamilton to Wells, of the land to defraud creditors.

2d. The consideration is greatly inadequate for the land.

3d. It was conveyed without any certain contract, but to cover it from creditors, until the parties could arrange the mode and manner of payment.

4th. The facts prove that Wells, knowing the indebtedness of Hamilton, colluded to protect the property, and finally obtained it for a trifling consideration, and Hamilton, nor his creditors, obtained any benefit from the Yocum claim.

McBRIDE, J., *delivered the opinion of the Court.*

The complainants filed their bill in the Platte Circuit Court against the defendants, in which they alleged that on the 6th February, 1844, they

obtained a judgment against Hamilton, before a justice of the peace in said county, for about $41, together with costs; and that the complainant, Martin, is beneficially interested in a judgment obtained against said Hamilton, in favor of Wilson & Baldwin, likewise obtained before a justice of the peace in said county, on the 4th March, 1844. That executions were regularly issued on the said judgments—placed in the hands of a constable, and by him returned "no property found," but he summoned the defendant, Wells, as garnishee, who answered under oath that he was in no wise indebted to his co-defendant, Hamilton.

That at the time of the commencement of the suits aforesaid against Hamilton, which was in the fall of 1843, the said Hamilton had a pre-emption on the north east quarter of section 27, township 53, range 35, situate in said county, and worth about $800. That the defendant, Wells, agreed with Hamilton to furnish $200, to enter the quarter section, provided Hamilton would convey to him the north half as soon as entered. That a short time prior to the rendition of the judgments against Hamilton, the agreement was consummated, and the land entered at the land office in the name of Hamilton, and immediately thereupon the certificate of entry, for the whole quarter section, was conveyed by assignment to Wells, fraudulently and without any valuable consideration, and for the purpose of preventing the said land from being sold to satisfy the debts of Hamilton. That Hamilton was largely indebted to other persons, and had no other estate out of which creditors could make their demands—that Wells was a near neighbor and fully apprised of his insolvency, and knew, at the time of transfer to him, that the complainants had instituted suits for the recovery of their demands, and at what time judgments would be rendred thereon.

That a few days before the entry of the land, by Hamilton, the complainants had a conversation with Wells about their claims, and the land and that Wells then told them that he was about buying the remaining 8 acres of Hamilton, and if he done so, he would retain in his hands an amount sufficient to pay their debts. That the transfer of the 80 acres afterwards made, was without consideration, or, if any thing was paid, it was done merely to give the semblance of fairness to the transaction that the said 80 acres was worth, at the time, at least $350 or $400.

That transcripts of the judgments aforesaid were regularly filed in the clerk's office of the Platte Circuit Court, and that executions were issued thereon by the clerk, and levied by the sheriff on the land in question, which having been sold, was purchased by the complainants for the sum of five dollars, and a deed executed accordingly.

The bill concludes with a prayer that the defendant, Wells, may be compelled to convey the half quarter section of land to the complainants; or so much thereof as shall be necessary to satisfy their demands against Hamilton; and for general relief.

Thos. Hamilton answered, admitting his indebtedness as charged in the bill. That he was entitled to the right of pre-emption on the quarter section described in the bill, but being unable to enter the land himself, he made an agreement with his co-defendant, Wells, by which Wells was to furnish $200, to make the entry, and to have one half of the land. That in conformity with said agreement, he went to the land office and made the necessary proof, when Wells furnished the $200, and the land was entered accordingly in his, Hamilton's, name. That the entry was made on the 30th October, 1843, and the certificate of entry for the whole quarter section was assigned to Wells on the same day—but before the west eighty acres was transferred, and as a valuable consideration therefor, Wells agreed to purchase for him a claim held by Mathias Yocum, on public land, and which he subsequently did obtain for the the sum of $75. That he considers the exchange a good one, not only for himself, but for his creditors, as the claim is of equal value to the 80 acres which he sold Wells. He tendered to the complainants his interest in the entire quarter section of land for $300; admits his inability to pay his debts; denies fraud, &c.

Charles Wells answered, admitting the judgments against Hamilton, and that he was garnisheed—that he answered then, and answers now, that he owed Hamilton nothing. Hamilton was entitled to the right of pre-emption in the quarter section described in the bill, in the fall of 1843, when the complainants commenced their suits against him, but denies that these judgments operated as a lien on the land, after the entry, inasmuch as he purchased prior to their rendition. The land was worth at the date of the entry $800—it was entered with his money, under an agreement with Hamilton, that he should have one half of the land for furnishing the entrance money for the whole. The entry was made on the 30th October, 1843, and the certificate was on that day assigned to him, by Hamilton, for the entire quarter section—that for the west half of the quarter section he agreed to purchase for Hamilton a claim of M. Yocum, which Hamilton said was worth as much as the entire quarter section which he had just entered. This claim he subsequently obtained and put Hamilton in possession, where he now resides.

The answer denies a knowledge, on the part of the respondent, of Hamilton's general indebtedness, but admits that he knew of the debts of

the complainants, and a demand due to Geo. P. Dorriss—he admits a conversation with the complainants, prior to his purchase, concerning the complainants' debts against Hamilton, and his purchase of the land, but denies ever having promised to hold the amount in his hands to satisfy these debts—he spoke to Hamilton concerning them, and Hamilton said he would see the complainants himself, and see if he could not get them to make a discount—denies a knowledge of suit having been commenced when he purchased of Hamilton, but supposed that he had paid the complainants, or made arrangements to that effect. He admits possession of the land, and that he has and still refuses to give possession, or convey any part, to the complainants—he also refused to pay the judgments or any part, not conceiving himself bound, either in law or equity, to do so. He may have talked about giving Hamilton's children something, but never did unconditionally promise to do so—in the event of his not getting the Yocum claim, he intended to give the children a part of the value of the land. He denies all fraud, &c.

Exceptions having been taken to the answer, and sustained, the defendant filed an amended answer, in which he states that although he lived within one mile of Hamilton, he was not intimately acquainted with him, and knew nothing of his embarrassment—that he had formed no opinion as to his solvency, either before or at the time of their trade— that about the 18th or 20th Nov., 1843, Hamilton apprised him that Yocum had a claim which he desired to sell, and if he would purchase that claim, he (Hamilton) would take it in the place of the west half quarter which he had assigned to defendant. That in a day or two he went and purchased the claim of Yocum for $75, Yocum saying he had another claim, and would take that sum, although the claim was worth two or three hundred dollars.

A general replication was filed to the answers, when the parties went to trial on the bill, answers, exhibits, and evidence, and the Court decreed in favor of the complainants. The defendants filed their motion to set aside the decree, which being overruled by the Court, they excepted, and have brought the case here by appeal.

The bill of exceptions shows the following to have been the testimony: Mathias Yocum testified, that Hamilton told him at Martin's mill, if he liked his claim he would give him $75 for it, in trade, that being the price he asked for the claim—Hamilton went to see the claim, and said he liked it better than he expected, and that he would buy it if he could get a certain man to help him. A few days afterwards, Hamilton, Wells, and another man, came down and brought a horse, which Wells said he would

give Hamilton, to assist in buying, and valued the horse at $40, which price he agreed to allow—Wells also said he had a rifle gun at home, worth $25, which he would let him have on the contract, and he went to Wells' house in a few days, and took the gun at $25—Wells also offered to give him other property, but he did not like the price, and said he would get the balance of the pay from Hamilton, and went over to his house, when he paid him a cow and two calves, valued at $10, which made up the sum of $75, the price agreed on for the land between him and Hamilton, for the claim.    The claim consisted of a fraction of a claim, of between 30 and 40 acres, situate in Green's bottom, on Bee creek; attached to it was the privilege of taking witness's interest in rails lying across Bee creek, on government land. Witness only sold his interest in the fraction above named—he would rather have had $50 in cash, than what he got for the claim—the land was good rich land, and he could have got $150 for his claim before the flood, which overflowed it—the fraction was all he claimed, and all he sold, but at the same time he told Hamilton he could have all the privileges he had over Bee creek, where he had enclosed about 20 acres, but the flood had washed down all the rails—Hamilton said he was satisfied on this side of the creek.    On the fraction were enclosed five or six acres, a cabin, corn-crib and stable—he also stated to Hamilton he could have all his interest over the creek, and if he could cross the creek and make out a full quarter, he could do so.    He sold all the claim which he had there, and no more—the claim consisted of between 30 and 40 acres of surveyed land on this side of Bee creek, with an improvement of 6 to 8 acres of fenced and cultivated land, cabin and stable, and some 18 to 20 acres of enclosed land on the other side of Bee creek, which was on unsurveyed land, and the fencing of which had been washed down, but the rails were on the ground, about 5000 rails—his claim over there consisted of just as much land, as he might be able to hold with his fraction on this side after it should be surveyed—he gave $120 for it— he sold to Hamilton no more than he could hold by law, and Hamilton run the risk as he done when he purchased.

William Yocum states that his brother sold to Wells or Hamilton, his claim in the Missouri bottom, for, as he understood, $75 in trade—the claim consisted of a fraction of about 33 acres of surveyed land, on Bee creek, south side, with an improvement of 6 or 8 acres on the fraction, a cabin and stable, also 18 or 20 acres of land under fence, which had been washed down with the flood, on the north side of the creek, and on unsurveyed public lands, with whatever of claim Mathias Yocum had

16

there—he did not think the claim was worth more than $20 dollars, although his brother gave $120 for it—the land was good, but had been overflown, and was now of much less value since the flood than before—the sale took place since the flood of 1843—the land was public land.

Brookenberry Frazier states that he purchased the claim from Hamilton, after the flood of 1844, for the sum of $15—that he looked on the claim as of trifling value since the overflows—there was not over 8 or 10 acres of improved land on the north side of Bee creek—the fences were washed down, and whether all the rails were there or not he did not know—he thought $50 would have been a big price for it at the time Yocum sold to Hamilton—the fraction of 33 acres was all that was entered—Hamilton moved to this place in February or March, 1844.

John R. Owen states that Wells, in a conversation with him, told him that he had promised James S. Thomas, to pay him the $40 debt due from Hamilton and Poe to White, which was for the benefit of Thomas, which is the debt in the bill mentioned. That in relation to the Wilson and Baldwin debt, which was for the benefit of complainant, Martin, Wells told him that Martin had better not have proceeded so soon against him by garnishment, as he would have some money for the benefit of Hamilton's children, after a while, or when he sold the land—that he did not know of the indebtedness of Hamilton to any one except the debts spoken of above—at that time he lived about one mile and a half from him—witness had two conversations with Wells, in both he promised to pay the Thomas debt—in the first, Martin sent him to see Wells, and see whether he would make any arrangement to secure that debt—the first conversation was in the fall or winter of 1843, the second in the winter of 1843-4—Wells stated, in speaking of the garnishment, that Martin would have done better not to have proceeded against him, as he did not owe Hamilton any thing, but would owe his children something—said the west 80 was worth some $400, and the whole quarter from $800 to $1000—the east half was most valuable—Hamilton was poor and unable to pay his debts, having nothing but this claim.

George P. Dorriss states that in December, 1842, he sued Hamilton for the sum of about $60, that he run his execution against him, and could make nothing—that it run on until lately—Hamilton had given him a horse in discharge of his debt—he did not know of any other indebtedness of Hamilton.

John Wilson states that he had a conversation with Wells in Plattsburg, about the debt from Hamilton to him and Baldwin—that he had heard that Wells was about purchasing the claim of Hamilton, and thought his only

chance to make their debt, was to get it out of that property, as he knew of no other property that Hamilton had. The conversation he had with Wells is substantially set out in his (Wells') answer—that he did not know of Hamilton's indebtedness to any other person, except to a small amount—this conversation was before the entry, but whether at the time, of the entry or not, he does not know—he told Wells if his debt could be saved, he would make a deduction—this conversation was in the summer or fall of 1843—all of the particulars of the conversation he does not recollect, but it left the impression on his mind that he could not secure his debt in that way.

William C. Remington states that Hamilton told him that he had got from Wells, for the land Wells, had got from him a horse and a gun—that he did not know of the indebtedness of Hamilton to any one—that Hamilton lived about a mile from Wells, and between Wells and Platte City, on the road from Wells' to Platte City.

The complainants then closed their evidence by reading the exhibits in their bill, to which no objection was made.

The defendants then introduced Thomas Hamilton, one of the defendants, who testified that he had a pre-emption right on the land now in controversy, but was not able to enter it—that he had various offers for it before the time of entry came on—that as the time approached the offers became less in value—at one time he was offered $500, and have the land entered—at another time he was offered $250, and enter the land himself, both of which he refused. That he got a fraction of about 33 acres of surveyed land on the south side of the creek, with some 6 acres in cultivation, a cabin and stable, and some 18 or 20 acres on the other side, under fence, which had been washed down, with the benefit of such claim as he might have after it was surveyed—that he looked on it as valuable to him, being near the river where the boats landed, and the wood he expected to be valuable, and he then thought it as valuable as the land he had sold—that Wells agreed with him to furnish the entrance money for the whole quarter section, for one half quarter, and he, Hamilton, to have choice of halves; and on the 30th October, 1843, he entered the land at the land office in Plattsburg, Wells furnishing the entrance money, and that he assigned the certificate for the quarter section to Wells, in the land office at the time; Wells, at the time of assignment, paying him nothing for the half quarter, of which he had choice, but promising him, (no writing being given,) that he, Hamilton, might sell it, and he, Wells, would convey to the purchaser, or Hamilton might select a claim on public land, and he, Wells, would purchase it for him, Hamilton, and keep

his, Hamilton's, half of said quarter as his, Wells', own.   That about two
weeks after the entrance of the land, and not so long as four weeks there-
after, he came across Mathias Yocum's claim of public land in the Mis-
souri bottom, and was pleased with it, and agreed with Yocum for it, at
$75 in trade, provided, as he told Yocum, he could get a friend to help
him pay for it.   That he went to Wells, who paid a horse at $40, and a
gun at $25, and not having other property upon which Wells and Yocum
could agree on the price, he, Hamilton, gave a cow and two calves of
his own at $10, and Wells afterwards paid him $10 in cash, for which
the cow and two calves were put into the trade.   On the purchase of the
claim from Yocum, Yocum executed a bill of sale to him, in which the
consideration was expressed to be $200, for the claim.   In the course of
his examination, some five minutes afterwards, he repeated the same thing,
and it was then demanded of him, why he had not inserted in the bill of
sale $75, according to the truth, instead of $200, when he hesitated, and
upon the enquiry of the attorney of *Wells*, whether the $200 in the bill
of sale was not by way of penalty, and the consideration expressed to be
for $75, he assented.   He said Wells wrote the bill of sale.   It was
demanded of him whether Wells had not promised to pay his children for
the half of the quarter entered, to which he replied, that such promise
had not been made *to him*.   It was then demanded if Wells had not made
such promise to the children, or any other person, to which, after a little
hesitation, he said not to his knowledge.   He said that at the time he
transferred the certificate to Wells, he trusted to Wells' honor for the
proper disposition of the half to which he was entitled, and then told Wells
that he wanted to sell it to pay his debts.   At the time he and Wells
started to pay Yocum for the claim bought of him, it was said between
him and Wells, that if Hamilton got the Yocum claim, it was to be in
full satisfaction for his half quarter of the land entered by him.   Says he
does not know the persons who offered him $500, nor the $250, for his
claim before its entry, they being strangers—that he had told Mr. Martin
that he wanted to sell his claim before its entry, and for Martin to make
him an offer, which he did not do—said he was anxious to sell his claim
to pay his debts, and after the entry had frequently offered to sell his half
but could find no purchaser, until it was disposed of to get the Yocum
claim, which he considered as valuable to him as the half quarter
which he let Wells have, and as much as he could get for it.   When de-
manded of him to whom he offered to sell the half quarter section of
entered land, he could not tell, but said he did not offer it to his creditors.
The claim obtained from Yocum has since been entered from him and he

has lost it—just before the entry by him, Martin, one of the complainants, applied to him to come to Platte City, and confess a judgment on the debt to him as assignee of Wilson and Baldwin, and he promised to do so, but was too sick to do it. Platte City is about one mile from where he lived, and Plattsburg, where the land office was located, was about thirty miles. None of his creditors lived over a mile and a half from him.

The only fact necessary for the complainants to establish, to entitle them to the decree rendered in their favor, by the Circuit Court, in this cause, and about which any difference of opinion can exist, is the fraud charged in the bill, in the conveyance by Hamilton to Wells, of the half quarter section, which, under the agreement, was to belong to Hamilton, in consideration of his right of pre-emption on the quarter section entered with the money of Wells.

The answer of the defendants, and the testimony preserved in the bill of exceptions, show that Hamilton was insolvent, and a settler on the public domain, and entitled, under the laws of congress, to a pre-emption on the quarter section of land whereon he lived, which was worth from $800 to $1000; whilst Wells was a neighbor, and although living within one mile of him, they were but slightly acquainted with each other, and the latter entirely ignorant of the pecuniary condition of the former. Under these circumstances, the answers allege that Hamilton applied to Wells to furnish him the means of entering the land on which he resided, and proposed, in consideration thereof, to give him one half of the land, Hamilton reserving to himself the right of selecting. If Wells was willing to advance $200 for the most indifferent half of the quarter about to be entered, the presumption is, that the other half was worth at least an equal sum.

The land was entered with the money of Wells, and instead of Hamilton executing to him a deed, or giving to him a bond to convey one half of the quarter, in conformity with the agreement, he, on the day of the entry in the land office, assigns or transfers to Wells the whole quarter section, and that without any previous agreement or consideration, touching the one half. Why such haste in divesting Hamilton and investing Wells with title? Such conduct being so foreign from the ordinary mode of transacting business, would be inexplicable but for the fact that, prior to this time, the complainants having learned that a negotiation was going on between the defendants concerning the land, had called upon the defendant Wells, and requested him to retain in his hands an amount sufficient of the purchase money to satisfy their demands against Hamilton. The transfer of the certificate for the entire quarter section, must and could only have

been superinduced to prevent the land from being subjected to the payment of the complainant's demand. No other satisfactory reason can possibly be assigned for the transfer, at the time it was made, nor is any attempted to be given by the defendants, for conduct so unusual, so inconsistent with propriety and the interest of Hamilton.

But it is said by the defendants, that after the assignment of the certificate of entry, and before the complainants acquired any lien by operation of law, on the half quarter owned by Hamilton, he sold the same to Wells for a valuable consideration, that is, for the Yocum claim. The Yocum claim, according to his description of it, was entirely vague and indefinite. It was a settlement on a fraction of 33 acres of government land, in the river bottom, subject to inundation, with two or three cabins, and six or eight acres in cultivation, together with as much land on the opposite side of the creek as he could hold, and some rails across the mouth of Bee creek.

Such a claim as this, estimated by some of the witnesses as worth only $20 or $30, and which was afterwards sold by Hamilton for $15, is estimated by defendants as being of equal value with the 80 acres of land admitted to be worth $400 or $500. It appears to be impossible that any rational man would make such a contract, and if Hamilton be such a simpleton as to know no better than make such a sale, Wells, as a conscientious man, should not consent to reap such a profit out of the weakness of his co-defendant.

We are of opinion that the Circuit Court committed no error in making the decree, and the other Judges concurring herein, the decree is affirmed.